UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JANIS MENSAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-01390-SRC |
| | ) | |
| JENNIFER CLEMONS-ABDULLAH et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### Memorandum and Order

While the Court does not resolve whether the late Tip O'Neill coined the phrase "all politics is local," this case evidences the statement's truth.  Turning on the local issue of an advisory board established by the City of St. Louis to provide, at least nominally, oversight of a notorious City jail, this case presents the following question:  does Janis Mensah state any viable federal claims against his archrivals for events surrounding the local board?

I.      **Background**

A.      **Factual background**

1.      **Establishing the Detention Facilities Oversight Board**

The Court accepts the following well-pleaded facts as true for purposes of the motion to dismiss.  (To promote clarity and avoid grammatical confusion, the Court uses the gender-neutral "he" when referring to Mensah, whose complaint uses the pronouns "they/them," to much ambiguity.  *Cf.* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress . . . words importing the masculine gender include the feminine as well.")).

In January 2022, the St. Louis Board of Aldermen passed, and then-Mayor Tishaura Jones signed, City Ordinance 71430, which established the Detention Facilities Oversight Board

("the Board"). Doc. 25 at ¶ 18. The Board acts as "an advisory body to the Mayor, Commissioner of Corrections[,] and the Director of Public Safety" regarding "detention facility operations, conditions of detention, and Division of Corrections policies." *Id.* at ¶ 19. The ordinance authorized Board members "to receive and investigate complaints of alleged Corrections Misconduct and Detention Incidents and make findings and recommendations based thereon." *Id.* The ordinance instructed the Commissioner of Corrections to provide Board members information about the jail facility, its inmates, and any incidents. *Id.* at ¶ 20.

The ordinance also instructed the Commissioner to provide Board members "access to City detention facilities at any time upon notice to the Commissioner and without conditions or requirements as to the timing or form of such notice." *Id.* at ¶ 21. It further required the Commissioner to "affirmatively send written notice to [Board] members" if there was a reason they could not enter or access the detention facility. *Id.* at ¶ 22. The Board of Aldermen passed a second ordinance in February 2023, *id.* at ¶ 23, which again provided "that [Board] members shall have access to information needed to conduct oversight," *id.* at ¶ 24.

### 2.    Commissioner of Corrections

Mensah alleges that the St. Louis City Commissioner of Corrections "is the highest ranked person inside the [D]epartment of Corrections," *id.* at ¶ 25, who acts as the "appointing authority" of the Department of Corrections and has "ultimate responsibility and authority over all personnel," *id.* at ¶ 26. Under the St. Louis City Charter, "appointing authority" is "any person or group of persons having power by law or ordinance, or by lawfully delegated authority, to make appointments to any position in the city service." *Id.* at ¶ 27.

According to Mensah, the Commissioner has the following responsibilities: (i) promulgating protocols, policies, and procedures to govern the actions of correctional

2

officers; (ii) giving "final sign off" on Division of Corrections policies and procedures; (iii) exercising authority over training jail staff and enforcing policies, protocols, and procedures; (iv) disciplining correctional officers for their actions; and (vi) making the final decision on which individuals may access the City Justice Center. *Id.* at ¶¶ 28–29. Mensah also maintains that no higher authority reviews the Commissioner's decisions regarding "the movement and permissions of outside visitors, staff, personnel, and inmates in the building." *Id.* at ¶ 31.

### 3.   History of issues with the Board

In March 2022, the Board of Aldermen approved Mayor Jones's appointment of Mensah to the Board. *Id.* at ¶ 35. After joining the Board, Mensah and other members "attempted several times to contact the Commissioner or other jail staff." *Id.* at ¶ 38. Then, in April 2022, Mensah and other Board members met with then-Commissioner Jennifer Clemons-Abdullah. *Id.* at ¶ 39.

Mensah alleges that, at this meeting, Clemons-Abdullah stated that "she did not think oversight of the [City Justice Center] facility was appropriate until she had been in her position longer." *Id.* at ¶ 40. Mensah also asserts that Clemons-Abdullah was hostile to Mensah, stating that she knew Mensah was "the one trying to take [her] job." *Id.* at ¶ 41.

Mensah maintains that Clemons-Abdullah limited the Board's access to the City Justice Center facility and its inmates, stating that the Board members would need to schedule visits "at a time of her choosing and provide a detailed itinerary that she could approve or deny." *Id.* at ¶ 42. Clemons-Abdullah also allegedly told Board members that "they could not speak with

3

detainees." *Id.* at ¶ 43.  According to Mensah, Clemons-Abdullah's conduct "contravened the requirements for access in the [Board] ordinance."  *Id.* at ¶ 44.

Mensah became Board Chairperson in August 2022.  *Id.* at ¶ 45.  After "numerous requests" from Mensah and other board members, Clemons-Abdullah permitted Mensah and other Board members to come to the City Justice Center for "an informal tour" in November 2022.  *Id.* at ¶ 46.  Mensah asserts that, following this tour, Clemons-Abdullah repeatedly thwarted the Board's efforts to conduct oversight by denying its requests to obtain documents, get testimony from Clemons-Abdullah, and access the facility.  *Id.* at ¶¶ 49–50.  Mensah further alleges that Clemons-Abdullah's actions violated the Board ordinances.  *Id.* at ¶ 51.  Mensah states that the Board brought this issue to the attention of the Mayor, the Director of Public Safety, and the Board of Alderman, all to no avail.  *Id.* at ¶¶ 52–54.

Deciding that enough was enough, Mensah emailed Clemons-Abdullah in April 2023, notifying her that Mensah would be stopping by the jail to conduct oversight.  *Id.* at ¶ 55.  After being turned away on one occasion, Mensah later gained access to the secured areas of the City Justice Center on April 14, 2023, after waiting for several hours in the lobby.  *Id.* at ¶¶ 56–58.  But jail staff removed Mensah from the building after a detainee began to share details with Mensah of "being maced, assaulted, and neglected by staff."  *Id.* at ¶ 58.  One week later, when Mensah returned for further oversight, jail staff told Mensah to go home, citing an allegedly false dress-code violation.  *Id.* at ¶ 59.  Mensah also states that Clemons-Abdullah responded "to only one of [Mensah's] emails about conducting facility oversight in an email sent on May 3, 2023."  *Id.* at ¶ 60.  Clemons-Abdullah then ignored the Board's reply email regarding oversight logistics.  *Id.* at ¶ 61.

4

Mensah increased oversight efforts in the spring of 2023 because "the conditions in [the City Justice Center] continued to be inhumane," resulting in seven inmates dying in Justice Center custody between April 2022 and June 2023. *Id.* at ¶¶ 62–63. Given "the escalating number of deaths" and Clemons-Abdullah's alleged obstruction of the Board's efforts, Mensah "was increasingly vocally critical of . . . Clemons-Abdullah throughout the spring and summer of 2023." *Id.* at ¶ 64. These criticisms included (i) a statement by the Board in April 2023 excoriating Clemons-Abdullah for "thwarting the will of the people" and violating the Board ordinances; (ii) a June 2023 letter from Mensah as Vice Chairperson asking Mayor Jones to request Clemons-Abdullah's resignation; and (iii) a series of interviews in August 2023 where Mensah "publicly criticized" Clemons-Abdullah for failing to keep a corrections officer safe after detainees held him hostage. *Id.*

Mensah asserts that Clemons-Abdullah was "well-aware" of Mensah's critical statements, *id.* at ¶ 65, that Clemons-Abdullah told City staff "that she had a personal dislike of [Mensah] based on [Mensah's] criticism of her, and that Clemons-Abdullah was "determined to make sure [Mensah] did not get access to the facility, *id.* at ¶ 68. Menah also alleges that, despite knowing about Clemons-Abdullah's behavior, desire to retaliate against the Board, and past retaliatory actions against other critics, no St. Louis City official acted to correct Clemons-Abdullah's actions. *Id.* at ¶¶ 66–67, 69–74. Instead, Clemons-Abdullah "continued to have sole authority" over the policies, procedures, supervision, and operations of the City Justice Center. *Id.* at ¶ 75.

### 4. Events of August 31, 2023 and after

At 4:30 p.m. on August 31, 2023—during Mensah's term as Vice Chairperson of the Board, *id.* at ¶ 45—the Board's Chairperson informed Mensah that another inmate had died at

5

the City Justice Center, *id.* at ¶¶ 76, 79.  After receiving this news, Mensah decided to visit the City Justice Center to "request information about the death directly from correctional staff."  *Id.* at ¶ 77.  Mensah asserts that he "had not received any prior written notice from the Commissioner" explaining that there were any circumstances that would preclude the Board's access to the City Justice Center.  *Id.* at ¶ 78.

Mensah arrived at the City Justice Center "shortly before 5:00 p.m."  *Id.* at ¶ 80.  While going through security, Mensah told a corrections officer that Mensah was a Board member there to speak to Deputy Commissioner Tammy Ross, *id.* at ¶ 83, the "second in command at the facility . . . who regularly communicated with [Mensah]," *id.* at ¶ 86.  According to Mensah, one of the staff members confirmed that another detainee had died at the facility.  *Id.* at ¶ 84.

Deputy Commissioner Ross then came into the lobby and asked Mensah why he was there.  *Id.* at ¶ 85.  Mensah requested that Ross allow Mensah to access the facility's "master control video room" to see surveillance videos showing the recent death of the detainee.  *Id.* at ¶ 88.  Ross "denied that a person had passed away," *id.* at ¶ 92, and then declined to answer Mensah's request for oversight because "she was leaving for the day," *id.* at ¶ 93.  Ross then "directed the corrections officer to allow [Mensah] past the metal detector and into the interior lobby."  *Id.* at ¶ 94.  Mensah waited in the lobby for over three hours, *id.* at ¶ 96, under the impression that, as with other visits, Mensah was "waiting while the Commissioner considered [Mensah's] request to conduct oversight," *id.* at ¶ 95.  Mensah was concerned that, if he left the lobby, his oversight request would be ignored, or the video footage would be deleted or altered.  *Id.* at ¶¶ 97–99.

Around 8:00 p.m., Captain Ann Flint arrived in the interior lobby.  *Id.* at ¶ 104.  At 8:08 p.m., Mensah asked a correctional officer when the lobby closed; the officer responded that

6

the interior lobby would close "when the last visit occurred," but that Mensah was "more than welcome" to stay in the exterior lobby. *Id.* at ¶ 100. At the time, the Justice Center's website stated that "non-professional visiting hours lasted until 9 p.m.," while "professional visitors could visit at any hour of the day." *Id.* at ¶ 103.

At 8:20 p.m., Captain Flint asked Mensah to move to the exterior lobby. *Id.* at ¶ 105. Two minutes later, Commissioner Clemons-Abdullah and Deputy Commissioner Ross entered the lobby, and Clemons-Abdullah asked why Mensah was still in the lobby. *Id.* at ¶¶ 106–07. Mensah responded that he was "there to see the master controls." *Id.* at ¶ 107. After this, Ross "briefly left the lobby to talk to correctional officers" and see about another Board member who was waiting to be let into the facility. *Id.* at ¶¶ 106, 108. Clemons-Abdullah did not give Mensah a final answer regarding oversight, *id.* at ¶ 109; instead, Clemons-Abdullah asked Mensah to "move to the outer vestibule," *id.* at ¶ 110, and then left the lobby, *id.* at ¶ 111. Ross then returned to the lobby, asked Mensah about the oversight request, stated "I'll be right back, I'll be right back," and left the lobby. *Id.* at ¶ 112. Mensah alleges that Captain Flint was present for Mensah's entire conversation with Clemons-Abdullah and Ross, *id.* at ¶ 114, and that Flint understood "that [Mensah] was not there for a social visit with an inmate but was a member of the [Board] asking to see surveillance footage," *id.* at ¶ 115.

Mensah alleges that Clemons-Abdullah did not tell Mensah that she was denying the oversight visit, nor did she say that Mensah had to leave the facility. *Id.* at ¶ 117. Instead, Clemons-Abdullah left the lobby and called the police at 8:27 p.m., asking police to get Mensah out of the lobby and stating that Mensah had no reason to be there. *Id.* at ¶ 118. Clemons-Abdullah did not tell Mensah that she called the police; Mensah had no interaction with City Justice Center staff for over half an hour. *Id.* at ¶¶ 119–20. During this time, Captain Flint

7

remained in the lobby and "did not ask [Mensah] to leave, move, or otherwise change [his] behavior." *Id.* at ¶ 121.  According to Mensah, at no point did Clemons-Abdullah, Ross, or Flint tell Mensah "to leave the building altogether." *Id.* at ¶ 122.  And because of the "relaxed atmosphere" and Ross's statement that she would be "right back," Mensah "believed [he] could remain seated where [he was]" until Clemons-Abdullah or Ross gave Mensah a response to the oversight request.  *Id.* at ¶ 123.

Just before 9:00 p.m., police officers Gonzales and Csapo responded to the City Justice Center lobby.  *Id.* at ¶ 124.  Captain Flint told the officers "that [Mensah] had been in the lobby too long and that Commissioner Clemons-Abdullah wanted [him] arrested."  *Id.* at ¶ 125.  Mensah was lying on a metal bench and sat up when the officers entered the lobby.  *Id.* at ¶ 126.  Mensah asserts that neither officer directly asked Mensah why he was in the lobby, *id.* at ¶ 127; rather, Officer Gonzales said, "Why are we not leaving when they ask you to leave?" and then told Mensah, "It's time to go," *id.* at ¶ 129.

Officers advanced on Mensah "[o]nly a minute after arriving on the scene, and only seconds after speaking to [Mensah]."  *Id.* at ¶ 130.  Mensah, who was "feeling afraid for [his] safety," then "moved [his] body backwards, away from the officers, and moved [his] hands under the arms of the metal bench."  *Id.* at ¶ 131.  The officers told Mensah to stand up, *id.* at ¶ 132, but "less than two seconds later, before [Mensah] could stand up," the officers "both put their hands on [Mensah] and began pushing and pulling [Mensah's] body, including Officer Csapo putting his body weight on top of [Mensah]," *id.* at ¶ 133.  Mensah maintains that the officers "did not give [Mensah] a verbal command to remove [his] hands from the bench," *id.* at ¶ 135; instead, "Officer Gonzales punched [Mensah] in the back with a closed fist," *id.* at ¶ 136.  Mensah asserts that he "unhooked [his] arm from the bench within 5 seconds of the officers

8

going 'hands-on,'" *id.* at ¶ 137, and that only after this point did officers tell Mensah that he was under arrest, *id.* at ¶ 138.  Mensah then put his hands up, attempting to comply with the officers' orders.  *Id.* at ¶ 139.

Mensah states that, although he made no verbal or physical threats to the officers, did not run away from the officers, and did not try to physically resist the officers' attempt to handcuff him, *id.* at ¶¶ 140–41, the officers forcibly removed Mensah from the bench "with such force that the officers moved the metal bench several feet," *id.* at ¶ 142.  The officers then "picked [Mensah] up and threw [him] to the floor," *id.* at ¶ 143, causing Mensah to hit his head and lose consciousness, *id.* at ¶¶ 144–45.  Once Mensah was on the floor, one officer knelt on top of Mensah, placing a knee in Mensah's back, *id.* at ¶ 146, while the other officer "punched [Mensah] several more times, again with a closed fist," *id.* at ¶ 147.  The officers then cuffed Mensah's hands and dragged an unconscious Mensah out of the building.  *Id.* at ¶¶ 150–52.  Mensah asserts that, before officers seized Mensah, Clemons-Abdullah and Ross "had reentered the lobby to watch the arrest," *id.* at ¶ 156, and Clemons-Abdullah merely "looked on as [Mensah] was assaulted, battered, and dragged out of the building," *id.* at ¶ 157.

The City Counselor of St. Louis later filed an information in St. Louis City Municipal Court, charging Mensah with one count of trespassing on private property and one count of resisting arrest.  *See id.* at ¶ 170; *see also* Information, *City of St. Louis v. Janis O. Mensah*, No. 24S2-MU00001 (St. Louis City Mun. Ct. Sept. 7, 2023) (showing trespassing charge); Information, *City of St. Louis v. Janis O. Mensah*, No. 24S2-MU00002 (St. Louis City Mun. Ct. Sept. 7, 2023) (showing resisting-arrest charge).  According to Mensah, the City's lawyers said "that they would dismiss the charges . . .  if [Mensah] would agree not to sue the Commissioner, SLMPD, or the City for their conduct."  Doc. 25 at ¶ 173.  Apparently refusing to take this deal,

9

Mensah proceeded to bench trial in the municipal-court cases, where the municipal-court judge found Mensah guilty of both charges.  *See* Order after Trial, *City of St. Louis v. Janis O. Mensah*, No. 24S2-MU00001 (St. Louis City Mun. Ct. Aug. 7, 2024).  Mensah then "faced a jury trial de novo in the Twenty-Second Judicial Circuit," where the court "acquitted [Mensah] of the charges after a directed verdict."  Doc. 25 at ¶ 176.  Because these state legal proceedings are "matters incorporated by reference" into Mensah's complaint, as well as "matters of public record," the Court may consider them for purposes of Defendants' motion to dismiss.  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation omitted).

### B.    Procedural background

Mensah originally sued Defendants in the Circuit Court of St. Louis City in August 2025.  *See* doc. 3.  Defendants then removed this case to federal court.  *See* doc. 1.  A few weeks later, Defendants filed their respective motions to dismiss.  Docs. 16, 18.  Mensah filed responses in opposition to the motions, docs. 20–21, but then amended the complaint shortly thereafter, docs. 22, 25.  The Court denied Defendants' motions to dismiss as moot.  Doc. 24.  Defendants Csapo and Gonzales filed their answer to Mensah's First Amended Complaint two weeks later.  Doc. 28.  After receiving an extension of time, docs. 26–27, Defendants City of St. Louis, Clemons-Abdullah, and Flint filed a motion to dismiss Mensah's First Amended Complaint under Rule 12(b)(6) for failure to state a claim.  Doc. 29.  The parties have fully briefed this motion, docs. 35, 39, 44, so it's ripe for the Court's review.

### II.    Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The notice pleading standard of Rule 8(a)(2) requires a plaintiff to give "a short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (citation omitted). The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010). Ordinarily, only the facts alleged in the complaint are considered for purposes of a motion to dismiss; however, materials attached to the complaint may also be considered in construing its sufficiency. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011) (citation omitted).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *See Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677–78.

11

### III.    Discussion

Because Defendants Csapo and Gonzales filed an answer in this case rather than a motion to dismiss, *see* doc. 28, the Court addresses only the claims Mensah brings against the other defendants.  In Mensah's First Amended Complaint, Mensah sues Clemons-Abdullah in her individual capacity under section 1983 for retaliation in violation of the First Amendment and failure to intervene in violation of the Fourth Amendment.  Doc. 25 at ¶¶ 180–96, 210–17. Mensah also sues Clemons-Abdullah in her individual capacity under Missouri state law for abuse of process.  *Id.* at ¶¶ 248–53.  Mensah next sues the City of St. Louis under section 1983, alleging that the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Doc. 25 at ¶¶ 218–25.  Finally, Mensah brings a state-law false-arrest claim against Clemons-Abdullah and Flint in their individual capacities.  *Id.* at ¶¶ 226–37.  The Court addresses each claim in turn.

### A.    Claims under 42 U.S.C. § 1983

On various claims, Clemons-Abdullah asserts qualified immunity.  *See* doc. 35 at 6–15. A defendant who seeks dismissal under Rule 12(b)(6) based on qualified immunity "must show that he is entitled to qualified immunity on the face of the complaint."  *Murphy v. Schmitt*, 143 F.4th 914, 918 (8th Cir. 2025) (citation modified) (quoting *Carter v. Huterson*, 831 F.3d 1104, 1107 (8th Cir. 2016)).  And a government official is entitled to qualified immunity unless "(1) the facts alleged by the plaintiff establish the violation of a constitutional right; and (2) the right was clearly established at the time of the official's alleged misconduct."  *Id.* (citing *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015)).  A right is "clearly established" when "it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (citation omitted).  While

12

a case need not be directly on point for a right to be clearly established, "existing precedent must have placed the . . . constitutional question beyond debate." *Id.* (citation omitted).  Courts must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (citation omitted).

### 1.      First Amendment retaliation

Mensah first asserts that Clemons-Abdullah violated Mensah's rights under the First Amendment when she "orchestrated [Mensah's] arrest and forcible removal from [the City Justice Center] in retaliation for [Mensah's] speech critical of her actions as [Commissioner]." Doc. 25 at ¶ 182.  At the outset, the parties dispute how the Court should construe Mensah's retaliation claim.

Clemons-Abdullah argues that Mensah brings a retaliatory-arrest claim.  Doc. 35 at 12; doc. 44 at 2.  But Mensah counters that the claim is an ordinary First Amendment retaliation claim based on Clemons-Abdullah's "falsifying a rationale for arrest."  Doc. 39 at 12.  The difference between these two claims is that the former would require Mensah to plead an additional element—i.e., "lack of probable cause or arguable probable cause"—while the latter would not.  *See Greenman*, 787 F.3d at 891.  The Court need not resolve this dispute, however, because it finds that Mensah fails to plausibly allege engaging in protected activity under the First Amendment.

### a.      Constitutional violation

Mensah alleges engaging in protected First Amendment activity in two ways:  (1) by vocally criticizing Clemons-Abdullah's actions as Commissioner of Corrections, doc. 25 at ¶¶ 64, 182, 186, and (2) by attempting to "lawfully gather[] information on the conditions of detention within [the City Justice Center]" (which Mensah posits is "an important stage of a

13

speech process"), *id.* at ¶¶ 190–91.  Clemons-Abdullah counters that Mensah did not engage in protected activity, because "waiting in a jail lobby has never been an established right under the First Amendment."  Doc. 35 at 11.

### i.      Information gathering

As to Mensah's attempt to gather information from the City Justice Center, the Court finds that Mensah has not plausibly alleged a constitutional right to do so.  The Supreme Court has "never intimated a First Amendment guarantee of a right to access all sources of information within government control."  *Eggenberger v. West Albany Twp.*, 820 F.3d 938, 942 (8th Cir. 2016) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978)).  Indeed, the First Amendment "guarantees a right to publish information, but not necessarily a right to *gain* information."  *Id.* (emphasis in original) (citing *Houchins*, 438 U.S. at 10).  "Accordingly, [Mensah] has no First Amendment right to access information which is not publicly available as a general matter."  *Id.* Here, Mensah does not allege that the information he sought to gather from the City Justice Center was publicly available.  *See generally* doc. 25.  Rather, Mensah states that he sought to gather this information "pursuant to the City Code authorizing oversight of the jail."  *Id.* at ¶ 191. Mensah therefore fails to plausibly allege a First Amendment right to gather the information from the City Justice Center, but instead asserts only a local-law right arising under the city ordinance establishing the board on which he served.

And to the extent Mensah argues that Clemons-Abdullah violated city ordinances by denying Mensah access to this information, such an argument fails to establish the violation of a federal right for purposes of a section 1983 action.  *See Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 965 (8th Cir. 2015) ("[V]iolations of state laws . . . do not by themselves state a claim under 42 U.S.C. § 1983.  Section 1983 guards and vindicates federal rights alone."

14

(citation omitted)).  The Court therefore grants Clemons-Abdullah's motion to dismiss as to the information-gathering portion of Mensah's First Amendment claim.

### ii.        Criticizing Clemons-Abdullah

But the First Amendment inquiry does not end there.  Mensah also alleges being "vocally critical of [Clemons-Abdullah] throughout the spring and summer of 2023," including one instance that occurred nine days before Mensah's arrest on August 31, 2023.  *See* doc. 25 at ¶ 64; *id.* at ¶¶ 182, 186.  Before the Court can analyze this claim, the Court must first determine the capacity in which Mensah was speaking.

Under St. Louis City Ordinance 71430 (incorporated by reference into Mensah's complaint, *see* doc. 25 at ¶¶ 19–22; *Zean*, 858 F.3d at 526)—which was in effect at the time the events in the complaint occurred—the Detention Facilities Oversight Board is a governmental entity in the City of St. Louis.  The Ordinance authorizes the Board to "review complaints," "initiate and oversee" criminal accountability investigations and professional inquiries, and "make findings and recommendations based thereon."  St. Louis, Mo., Ordinance 71430 (Jan. 20, 2022).  The Board also possesses "the power to administer oaths, to subpoena and require the attendance of witnesses located within the City and the production by them of books and papers pertinent to any matter of inquiry[,] and to examine such witnesses under oath."  *Id.*  The Board submits quarterly and annual reports to the Commissioner of Public Safety.  *Id.*  And it receives City funds.  *Id.*  Its members are nominated by the Mayor or Chairperson of the Public Safety Committee and confirmed by the Board of Aldermen.  *Id.*  And, perhaps most importantly, the Board's proceedings must comply with Missouri's Sunshine Law, *id.*, which applies to "public governmental bod[ies]," Mo. Rev. Stat. § 610.021.

15

Some Board positions—such as its director, investigators, paralegal, and secretary—receive compensation and are considered "employees" of the City. St. Louis, Mo., Ordinance 71430 (Jan. 20, 2022). But for Board positions like Mensah's, the Ordinance is less clear. The Ordinance refers to those possessing a role like Mensah's as "members," rather than employees. *Id.* It does not state that those with Mensah's role receive compensation. *Id.* And it states that, to be eligible for a role like Mensah's, a person "[m]ust not be an employee of the City of St. Louis or of the State of Missouri." *Id.*

But even if this ambiguity renders Mensah a volunteer, rather than a civil servant, the Court finds that the First Amendment analysis applicable to public employees still applies. *See, e.g.*, *Shands v. City of Kennett*, 993 F.2d 1337, 1340, 1342–43 (8th Cir. 1993) (applying public-employee First Amendment analysis to retaliation claims of volunteer-firefighter plaintiffs). In reaching this conclusion, the Court finds persuasive the Eleventh Circuit's "de facto-employee" reasoning in *Jarrard v. Sheriff of Polk County*, 115 F.4th 1306, 1316–18 (11th Cir. 2024). In that case, the court stated that the relevant question for First Amendment purposes is whether a plaintiff's volunteer participation renders him a "de facto employee." *Id.* at 1316–17. This requires courts to examine whether (1) the plaintiff was delivering government services, and (2) the plaintiff's position bears "any of the traditional hallmarks of employment." *Id.* at 1317–18.

Here, assuming Mensah served as a volunteer on the Board, the Court finds that Mensah's participation rendered Mensah a "de facto employee" for First Amendment purposes. *Jarrard*, 115 F.4th at 1317. The Board's investigation of corrections misconduct promotes the safety of prisoners and detainees at the St. Louis City Justice Center, which furthers the City's duty under the Eighth and Fourteenth Amendments to protect these inmates from the

16

"unnecessary and wanton infliction of pain." *Hamilton v. Earl*, 166 F.4th 1143, 1146 (8th Cir. 2026) (citation omitted). And although Mensah may not have received compensation for serving on the Board, Mensah's position still bore some of the "traditional hallmarks of employment." *Jarrard*, 115 F.4th at 1318. For instance, Mensah applied to join the Board, the Mayor appointed Mensah to serve on the Board from a pool of candidates, and the Board of Aldermen approved Mensah's appointment. *See* doc. 25 at ¶¶ 32–35; *see also* St. Louis, Mo., Ordinance 71430 (Jan. 20, 2022). *Contra Jarrard*, 115 F.4th at 1318 (noting that volunteer's position bore no "traditional hallmarks of employment" in part because all he did to become a volunteer was put his name on a list).

Separately, the Court finds significant that Mensah served on a body created by city ordinance—that is, by duly passed legislation—rather than by resolution or proclamation. *See* St. Louis, Mo., Ordinance 71430 (Jan. 20, 2022). And Mensah and the other Board members had "responsibilities with respect to confidentiality, Missouri's Sunshine Law," and the rights afforded citizens, detainees, and corrections employees under Missouri and federal law. *Id.* Members also had to act in conformance with "the City's Civil Service Rules and Regulations." *Id.* These facts further indicate that Mensah acted, at the very least, as a de facto employee.

Thus, whether Mensah was an unpaid volunteer or a compensated civil servant, the Court finds that Mensah's complaint demonstrates that he bears nearly all of the hallmarks of a public employee and very few of the indicia of an ordinary citizen as to the actions at issue in this case. The Court therefore treats Mensah's role as akin to that of a public employee for First Amendment purposes. *See Shands*, 993 F.2d at 1340, 1342–43; *Jarrard*, 115 F.4th at 1316–18; *see also McKinley v. Kaplan*, 262 F.3d 1146, 1147–50 (11th Cir. 2001) (applying public-

17

employee First Amendment analysis to retaliation claims of volunteer, unpaid county advisory board member).

The Court accordingly analyzes Mensah's First Amendment retaliation claim under the framework set out in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Board of Education*, 391 U.S. 563 (1968). Under this framework, "[w]hen a public employee engages in speech in the performance of [his] official duties, that speech is unprotected under the First Amendment." *Thomas v. Marshall Pub. Schs.*, 152 F.4th 884, 889 (8th Cir. 2025) (citing *Lyons v. Vaught*, 875 F.3d 1168, 1173 (8th Cir. 2017)). Determining whether an employee spoke pursuant to his official duties requires a "practical inquiry." *Id.* (citation omitted). An employee speaks pursuant to his official duties if the speech "owes its existence" to the employee's professional responsibilities. *Id.* (citation omitted). But an employee may also speak pursuant to his official duties even when the speech "was neither required by [his] job description nor requested by [his] employer." *Id.* The key question is "whether the speech is 'ordinarily within the scope' of the employee's duties." *Id.*

The allegations in the complaint establish that Mensah spoke pursuant to his official duties when criticizing Clemons-Abdullah. First, Mensah alleges that in April 2023, Mensah "and the rest of the [Board] formally released a statement regarding 'Divisions of Corrections Obstruction,'" which excoriated Clemons-Abdullah for allegedly violating Ordinance 71430. Doc. 25 at ¶ 64(a). This statement is incorporated by reference into Mensah's complaint. *See Zean*, 858 F.3d at 526. The Board published this statement on its website. *See Detention Facility Oversight Board Public Statement about Division of Corrections Obstruction*, STLOUIS-MO.GOV (May 15, 2023), https://www.stlouis-mo.gov/government/departments/public-safety/civilian-oversight/detention-facilities-

18

oversight/documents/upload/DFOB-Public-Statement-April-2023.pdf [https://perma.cc/U3AF-75NQ]; *see also Mungai v. Univ. of Minn.*, 141 F.4th 959, 965 & n.2 (8th Cir. 2025) (considering a website to be part of the public record for Rule 12(b)(6) purposes).  And this statement speaks on behalf of the Board as a whole, rather than Mensah individually.  *See* doc. 25 at ¶ 64(a).  Thus, this statement "owes its existence" to Mensah's role on the Board.  *Thomas*, 152 F.4th at 889.

Second, Mensah alleges that on June 5, 2023, Mensah wrote to the Mayor and Interim Public Safety Director "in [Mensah's] role as Vice Chairperson" and "on behalf of the full [Board]" to request Clemons-Abdullah's resignation.  Doc. 25 at ¶ 64(b).  Mensah also gave "contemporaneous statements to the press" regarding this letter.  *Id.*  This letter is incorporated by reference into Mensah's complaint.  *See Zean*, 858 F.3d at 526.  While this letter is not on the Board's official website, a copy of the letter can be found online.  *See Chair of City Detention Facility Oversight Board Calls for Changes, Corrections Commissioner to Resign*, KSDK (June 6, 2023), https://www.ksdk.com/article/news/local/detention-facility-oversight-board-st-louis/63-d784444d-98ca-4ebd-88e9-0456fe643122 [https://perma.cc/8WXK-WXJ8] ("*KSDK Article*"); *see also Mungai*, 141 F.4th at 965 & n.2.

The letter is on the Board's official letterhead and states that it is an "official letter on behalf of the Detention Facilities Oversight Board" and that the Board members "unanimously voted to send [the] letter."  *KSDK Article*.  It is signed by Mensah on behalf of himself and the entire Board.  *See id.*  Thus, this letter also "owes its existence" to Mensah's role on the Board.  *Thomas*, 152 F.4th at 889.  As do Mensah's contemporaneous statements to the press.  *See Bonn v. City of Omaha*, 623 F.3d 587, 593 (8th Cir. 2010) (finding that plaintiff, a public safety

19

auditor, spoke pursuant to her official duties when she made comments to media about a report she published).

Finally, Mensah alleges that on August 22, 2023, Mensah "gave several interviews . . . publicly criticiz[ing] . . . Clemons-Abdullah for failing to keep [an] officer safe" after detainees at the City Justice Center held the officer hostage.  Doc. 25 at ¶ 64(c).  Mensah gave these interviews during his time as Vice Chairperson of the Board, and he did so in response to "the complete obstruction of the [Board] and the escalating number of deaths and other incidents in the [City Justice Center]."  *Id.* at ¶ 63; *see id.* at ¶ 64.  The Court thus finds that Mensah made these statements pursuant to Mensah's official Board duties.  *See Thomas*, 152 F.4th at 889.

Having found that Mensah spoke pursuant to his official duties, the Court finds that Mensah fails to allege that he engaged in protected activity.  *Id.*  Mensah therefore fails to state a claim for retaliation under the First Amendment, *see id.*, so the Court grants Clemons-Abdullah's motion to dismiss on this ground.

### 2.    Failure to intervene

Mensah next asserts that Clemons-Abdullah violated Mensah's Fourth Amendment rights by failing to intervene when Officers Gonzales and Csapo used excessive force against Mensah. *See* doc. 25 at ¶¶ 210–17.  Clemons-Abdullah argues that this claim fails because "it is not clearly established whether a jail custodian has the duty to intervene in force used by the police on a civilian . . . who was not within corrections' legal custody or control."  Doc. 35 at 15.  The Court agrees.  True, the Eighth Circuit has noted that, as of July 2006, "it was clearly established that a state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).  But importantly, "[t]he duty to intervene

20

must be clearly established in the specific context of the case." *Dukeman v. Ste. Genevieve Cnty.*, 167 F.4th 500, 505 (8th Cir. 2026).

Here, the parties have not cited, nor has the Court found, Supreme Court or Eighth Circuit authority establishing that a corrections officer has a duty to intervene to prevent officers from a different department from using excessive force when the corrections officer lacks custody over the victim. To the contrary, the cases the Court has located indicate a duty to intervene when the officer (1) belongs to the same department as the officer using excessive force, *see, e.g.*, *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009), or (2) belongs to a different department that exercises joint custody over the victim, *see Buckner v. Hollins*, 983 F.2d 119 (8th Cir. 1993). Neither of those situations applies here. Mensah alleges that Clemons-Abdullah was a member of the St. Louis Department of Corrections—not a member of SLMPD—at the time Officers Gonzales and Csapo allegedly used excessive force against Mensah. *See* doc. 25 at ¶¶ 7, 25. Mensah also does not allege that Clemons-Abdullah or anyone else at the City Justice Center had custody over Mensah during the relevant period. Thus, the Court finds that Clemons-Abdullah's duty to intervene, if any, was not "clearly established in the specific context of the case." *Dukeman*, 167 F.4th at 505; *see also id.* (holding that state highway patrol trooper did not have duty to intervene against force used by police canine from another law enforcement agency). The Court finds that Clemons-Abdullah is entitled to qualified immunity, so it dismisses Mensah's failure-to-intervene claim.

## B.    *Monell* claim

Next, Mensah brings a 1983 claim against the City of St. Louis pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See* doc. 25 at ¶¶ 218–25. A municipality may be liable under *Monell* for a constitutional violation that results from "(1) an official

21

government policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Sorcan v. Rock Ridge Sch. Dist.*, 131 F.4th 646, 651 (8th Cir. 2025) (citation modified). An official policy is "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Corwin v. City of Indep.*, 829 F.3d 695, 700 (8th Cir. 2016) (citation omitted). "A single decision by a government's authorized decisionmakers to adopt a particular course of action surely represents an act of official government policy, regardless of whether or not that body had taken similar action in the past or intended to do so in the future." *Sorcan*, 131 F.4th at 651 (citation modified) (quoting *Pembaur v. City of Cinn.*, 475 U.S. 469, 480–81 (1986)). "In addition to creating municipal liability for their own actions, final policymakers can also create this liability by either delegating policymaking authority to a subordinate or ratifying the actions of a subordinate." *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017).

Here, Mensah alleges that Clemons-Abdullah acted as the final policymaker of the City of St. Louis because she "was given complete discretion to control operations" of the Justice Center by City ordinance. Doc. 25 at ¶ 220; *see also id.* at ¶¶ 25–31. In the alternative, Mensah alleges that the Mayor, the Board of Aldermen, and the Interim Public Safety Director delegated final policymaking authority to Clemons-Abdullah over "who was permitted access [to or] excluded from" the Justice Center. *Id.* at ¶ 222; *see also id.* at ¶ 54. And as one final alternative, Mensah alleges that final policymakers in the City of St. Louis ratified Clemons-Abdullah's conduct by (1) defending her actions, (2) prosecuting Mensah, and (3) allowing Clemons-Abdullah continued control over who could (and could not) access the Justice Center. *Id.* at ¶ 223; *see also id.* at ¶¶ 66–67, 69–70, 74–75, 168–70.

22

For her part, Clemons-Abdullah does not challenge the adequacy of Mensah's allegations regarding Clemons-Abdullah's final policymaking authority. *See* doc. 35 at 15–16; doc. 44 at 9 n.4. Instead, Clemons-Abdullah challenges only Mensah's allegation that she violated Mensah's clearly established constitutional rights. Doc. 25 at 15–16; doc. 44 at 9 n.4. As explained above, the Court finds that Mensah fails to plausibly allege that Clemons-Abdullah violated Mensah's constitutional rights. Thus, the Court grants the motion to dismiss on this ground.

### C.      State-law claims

Mensah also asserts state-law claims against Clemons-Abdullah and Flint for false arrest and abuse of process. *See* doc. 25 at ¶¶ 226–37, 248–53. The Court notes that it still retains federal question jurisdiction over Mensah's Fourth Amendment excessive-use-of-force claim against Officers Gonzales and Csapo. *See id.* at ¶¶ 197–209; 42 U.S.C. § 1983; 28 U.S.C. § 1331. Nonetheless, the Court declines to exercise supplemental jurisdiction over Mensah's false-arrest and abuse-of-process claims, as the Court finds that these claims "substantially predominate[]" over the remaining Fourth Amendment claim. 28 U.S.C. § 1367(c)(2); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966) (noting that a federal court may decline to exercise supplemental jurisdiction "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought"). The Court also finds that federal-state comity counsels in favor of remanding these state-law claims. *See Hunter v. Page Cnty.*, 102 F.4th 853, 870 (8th Cir. 2024) (noting the four interests underlying the supplemental jurisdiction statute: "comity, fairness, judicial economy, and convenience" (citation omitted)).

The Court separately notes that Mensah brings state-law claims for assault and battery against Officers Gonzales and Csapo in addition to the Fourth Amendment excessive-use-of-

23

force claim. *See* doc. 25 at ¶¶ 238–47. As previously noted, Officers Gonzales and Csapo filed an answer in this case, rather than challenging these claims in a motion to dismiss. Doc. 28. Because of this, and because the state and federal claims against Officers Gonzales and Csapo arise out of a discrete set of facts (i.e., their arresting Mensah on August 31, 2023), the Court finds that judicial economy counsels in favor of keeping the assault and battery claims in federal court, at least for the time being. *See Hunter*, 102 F.4th at 870. The Court will therefore exercise supplemental jurisdiction over these state-law claims. *See* 28 U.S.C. § 1367(a). Should the federal claims against Officers Gonzales and Csapo be dismissed or otherwise removed from the case, the Court may revisit the issue of supplemental jurisdiction.

## IV.    Conclusion

Accordingly, the Court grants Defendants' [29] motion to dismiss as to Mensah's First Amendment, Fourth Amendment, and *Monell* claims. Pursuant to 28 U.S.C. § 1447(c), the Court remands Mensah's false-arrest and abuse-of-process claims to the Circuit Court of St. Louis City, Missouri and directs the Clerk of Court to mail a certified copy of this order of remand to the clerk of the state court. A separate order of remand accompanies this Memorandum and Order.

The Court also dismisses Clemons-Abdullah, Flint, and the City of St. Louis from this action with prejudice. A separate order of partial dismissal accompanies this Memorandum and Order.

So ordered this 10th day of August 2026.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE